IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF UTAH
CENTRAL DIVISION

| | |
|---|---|
| JOSEPH and GAIL F., individually and as guardians of N.F., a minor,<br><br>Plaintiffs,<br><br>v.<br><br>SINCLAIR SERVICES COMPANY, and SINCLAIR SERVICES COMPANY POINT OF SERVICE BASIC (POS BASIC) PLAN,<br><br>Defendants. | **MEMORANDUM DECISION AND ORDER**<br><br>Case No. 2:14-cv-00505-RJS<br><br>Judge Robert J. Shelby |

This is an ERISA case.[1]  Plaintiffs Joseph and Gail F. sued Defendants Sinclair Services Company and Sinclair Services Company Point of Service Basic Plan after Sinclair's Plan Administrator denied the F. Family's claim for benefits relating to long-term residential treatment services rendered to its minor daughter, N.F., for depression.  The F. Family and the Plan Administrator cross-move for summary judgment on the F. Family's claim for benefits.  For the reasons stated below, both motions are granted in part and denied in part.[2]

## BACKGROUND

The F. Family lives in Carbon County, Wyoming.  Sinclair employs Joseph F. and provides the F. Family with group health coverage through a self-funded employee benefit plan.  N.F., the F. Family's minor daughter, was a beneficiary of the Basic Plan during 2012 and the Plus Plan during 2013.  Before addressing the legal issues presented, the court first discusses the relevant parts of the Basic and Plus Plans, N.F.'s medical treatment, and the procedural history of

---

[1] ERISA stands for the Employee Retirement Income Security Act of 1974.
[2] After examining the briefs and record submitted by the parties, the court concludes that oral argument will not materially assist the court in resolving this dispute.  The court therefore issues this Order without oral argument.

the case.

## I.    The Plan

The Plan terms are summarized in a Summary Plan Description booklet.  The Summary

includes "[t]erms that have technical or special meanings [that] are printed in *italics* and defined

in the Definitions section" of the booklet.[3]

Health benefits under the Plan "are affected by certain limitations and conditions."[4]  For

example, benefits are determined by a beneficiary's needs and the costs involved.  Similarly,

"health benefits are not provided for every kind of medical treatment or service, even if [the

beneficiary's] *health care provider* recommends them."[5]  Rather, the Plan provides benefits only

for medically necessary treatment.[6]

Within these limitations, the Plan allows beneficiaries "to choose among *health care*

*providers* in a *network*."[7]  An example of a health care provider is a specialized treatment facility.

Residential treatment and skilled nursing facilities are two types of specialized treatment

facilities.  A residential treatment facility is a "child-care institution that provides residential care

and treatment for emotionally disturbed children and adolescents."[8]  By contrast, a skilled

nursing facility provides "continuous skilled nursing care for persons during the convalescent

stage of their *illness* or *injury*."[9]  The network is the "group of *Health Care Providers* with whom

Sinclair has contracted."[10]

The Plan provides an Out of Area Program for individuals who live in non-network areas.

---

[3] Pre-Litigation Record (Dkt. 23), at 10.  The parties refer to the Pre-Litigation Record as "REC."  The court adopts the same approach.
[4] *Id.* at 10.
[5] *Id.*
[6] *Id.* at 12.
[7] *Id.* at 10.
[8] *Id.* at 60.
[9] *Id.*
[10] *Id.* at 57.

The Program provides coverage "to those who live in an area where one of Sinclair's *networks* does not exist, and to those who receive health care services while traveling (for purposes other than obtaining health care services) outside of the area where one of Sinclair's *networks* is available."[11]  A beneficiary lives in a "*non-network area* if there are no *network health care providers* within a 50 mile radius of [the beneficiary's] principal residence."[12]  A beneficiary living in a non-network area may select any licensed health care provider.

The Plan also includes a provision styled Use of Network Providers During Travel.  The provision states, "[w]hether or not you live in an area where a *network* provider is available, if you travel to an area where a *network* provider is available, you must utilize the *network* (assuming that the treatment is not an emergency)."[13]

The Plan is administered by a Plan Administrator.  The Administrator is the Plan's "sole fiduciary" who "exercises all discretionary authority and control over the administration of the *Plan* and the management and disposition of *Plan* benefits."[14]  The Administrator has "the sole discretionary authority to determine eligibility for *Plan* benefits or to construe the terms of the *Plan*."[15]

Finally, the Plan excludes certain services and supplies, "even if they are *medically necessary* or recommended by a *health care provider*."[16]  For instance, the Plan does not provide benefits for cosmetic surgery or obesity treatment.  And after an amendment took effect on January 1, 2013, the Plus Plan—of which N.F. was a beneficiary as of January 1, 2013—no

---

[11] *Id.* at 11.

[12] *Id.*  In the Definitions section, the Plan states that a non-network area is "a location for which the Out of Area Program is available, defined as an area in which no *network health care providers* exist within a 50 mile radius." *Id.* at 57.

[13] *Id.* at 11.

[14] *Id.* at 58.

[15] *Id.*

[16] *Id.* at 18.

longer provided benefits for residential treatment services, even though benefits for residential treatment services were provided in 2012.[17]

## II.  N.F.'s Medical Treatment

N.F. has suffered from serious mental, emotional, and behavioral health conditions.  In early 2012, N.F. spent six weeks at an acute psychiatric hospital in Texas for suicidal ideation. The Texas facility provides inpatient treatment to adolescents and adults with complex mental health conditions.  Before discharging N.F., staff at the Texas facility recommended that she receive long-term treatment at an all-girls facility.  The staff warned that "placing [N.F.] in an inappropriate facility for her needs could actually worsen her condition."[18]  The staff therefore recommended "a program similar to Moonridge Academy or New Haven [Residential Treatment Center]."[19]  Both programs are non-network facilities in Utah.

Following those recommendations, the F. Family admitted N.F. at Moonridge on May 23, 2012.  Moonridge is a licensed residential treatment facility in Cedar City, Utah.  N.F. received treatment at Moonridge until September 7, 2012.  After Moonridge discharged N.F., the F. Family admitted her at New Haven, a licensed residential treatment facility in Utah County, Utah.  The F. Family withdrew N.F. from New Haven on March 1, 2013.

## III.  Procedural History

While N.F. was receiving treatment at Moonridge and New Haven, the F. Family worked with the Administrator to determine what coverage was available for N.F.'s treatment.  The Administrator initially told the F. Family that because the F. Family traveled to Utah—a network area—coverage would be available only for treatment provided at Youthcare, a network facility in Salt Lake City, Utah.  Youthcare provides only coed treatment.  The Administrator denied

---

[17] *See* Dkt. 27, Ex. 1.
[18] REC at 96.
[19] *Id.* at 112.

coverage for treatment N.F. received at Moonridge and New Haven.

The F. Family appealed the denial of coverage in May 2012.  In its appeal, the F. Family argued that Youthcare was inappropriate for N.F. based on recommendations from the Texas facility's staff.  The F. Family also noted that Moonridge was willing to consider a single-case agreement with the Plan.

The Administrator again denied coverage in June 2012.  The Administrator maintained that the Plan did not cover out-of-network care.  The Administrator, however, did not address the F. Family's argument that Youthcare was not appropriate for N.F.  Nor did the Administrator comment on Moonridge's willingness to negotiate a rate of reimbursement for N.F.'s treatment.

The F. Family submitted a second appeal letter in December 2012.  In it, the F. Family pointed out that there are no network providers of all-girls residential care within fifty miles of its home in Wyoming.  The F. Family argued that the Plan should therefore cover N.F.'s expenses because the Out of Area Program provision states that the Plan covers services rendered by non-network providers when there are no network providers within a fifty mile radius of the beneficiary's principal residence.  The F. Family also contended that the Plus Plan's post-January 1, 2013, residential treatment exclusion violated the Paul Wellstone and Pete Domenici Mental Health Parity and Addiction Equity Act of 2008.

The Administrator again denied the F. Family's claim in February 2013.  The Administrator reiterated that the Plan does not cover out-of-network care.  It concluded if a "Plan participant travels to an area to obtain health care services and a network provider is available, the participant must utilize a network provider" to receive benefits.[20]  The Administrator cited page three of the Summary Plan Description as support for its conclusion.  Page three includes

---

[20] *Id.* at 2.

the Out of Area Program provision and the Use of Network Providers During Travel provision. And in response to the F. Family's Parity Act argument, the Administrator stated that the Plus Plan no longer provided benefits for residential treatment under an amendment that took effect on January 1, 2013. The Administrator directed the F. Family to an attachment containing the notice of the amendment to the Plus Plan. The attachment is not contained in the administrative record before the court, but the Administrator has submitted it as an exhibit.

The F. Family submitted a third and final appeal in March 2013. In this appeal, the F. Family appealed the Administrator's denial of claims for both Moonridge and New Haven. The F. Family again disputed the Administrator's interpretation of the Out of Area Program provision. The F. Family also argued the amended Plus Plan violated the Parity Act by excluding residential treatment from coverage. According to the F. Family, the Plus Plan imposed an improper nonquantitative treatment limitation because the Plus Plan covered medical and surgical benefits analogous to residential treatment but did not provide coverage for similar mental health benefits.

The Administrator issued its final denial of the F. Family's claims in May 2013. In making its denial, the Administrator stated:

> [T]he Plan Administrator reviewed the terms of the Plan document, all information provided by Moonridge Academy and New Haven Residential Treatment Center concerning the claims and this appeal, the original claims and other information provided to the Plan when the claims were filed, all correspondence and other written information received by the Plan from you and from the providers of the services concerning the original claims, the original notice of adverse benefit determination dated February 7, 2013 concerning the claims which are the subject of this appeal, and your appeal letter dated March 28, 2013 and all attachments to the appeal letter. The Plan Administrator made a full and independent review of the appeal, and did not afford deference to the initial adverse benefit determinations.[21]

---

[21] *Id.* at 114.

The Administrator also distinguished between claims incurred before January 1, 2013, and claims incurred on or after January 1, 2013.  The Administrator denied the claims for both periods, but for different reasons.

The Administrator first denied the claims incurred before January 1, 2013, because the "Basic Plan does not provide benefits for care or services received from non-network providers."[22]  The Administrator acknowledged that the Plan pays benefits for non-network providers located within the participant's non-network area if there are no network providers within fifty miles of the participant's residence.  The Administrator noted that the purpose of the Out of Area Program provision "is to provide Plan benefits to participants who do not live close to a network provider which are comparable to the benefits provided by the Plan to participants who do live close to a network provider."[23]

The Administrator's denial, however, turned on its interpretation of the Use of Network Providers During Travel provision.  Under that provision, the Plan provides benefits "if a participant travels to obtain care to an area where a network provider is available . . . [and] utilizes a network provider . . . .  For this purpose, the Plan Administrator interprets area to mean a state."[24]  The Administrator explained that because N.F. traveled to Utah—where there was a network residential treatment facility—to receive treatment and the F. Family's claims were for services provided by non-network providers, the Plan provides no benefits.

Second, the Administrator denied the claims incurred on or after January 1, 2013, because the "Plus Plan does not provide benefits for care or services received at residential treatment centers," whether in or out of network.[25]  The Administrator refuted the F. Family's argument

---

[22] *Id.*
[23] *Id.* at 116.
[24] *Id.*
[25] *Id.* at 114.

that the exclusion of residential treatment violates the Parity Act.  The Administrator concluded

that the Plus Plan "does not make impermissible distinctions between its payment of claims for

Medical/Surgical benefits and Mental Health/Substance Abuse (MH/SUD) benefits."[26]  The

Administrator stated:

> The Plan does not provide any benefits for services at residential treatment
> centers, regardless of whether the services are for Medical/Surgical
> treatment or for Mental Health/Substance Abuse treatment.  The Plan
> provides benefits for skilled nursing services both for Medical/Surgical
> treatment and Mental Health/Substance Abuse Disorder treatment, if the
> other requirements of the Plan, such as medical necessity, are met.  The Plan
> is not required under [the Parity Act] to provide benefits for services at
> residential treatment centers, and it is not required by that law to provide
> these benefits because it provides benefits for services at skilled nursing
> facilities.

The F. Family then brought this ERISA suit in July 2014 to recover benefits pursuant to

29 U.S.C. § 1132(a)(1)(B).  Both the F. Family and the Administrator now move for summary

judgment on the F. Family's claim.

## LEGAL STANDARD

In general, summary judgment is appropriate "if the movant shows that there is no

genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of

law."[27]  A material fact is one that "might affect the outcome of the dispute under the applicable

law,"[28] and a party must show more than "some metaphysical doubt as to the material facts" to

establish a genuine dispute.[29]

But in an ERISA case where both parties have moved for summary judgment, "summary

judgment is merely a vehicle for deciding the case; the factual determination of eligibility for

benefits is decided solely on the administrative record, and the non-moving party is not entitled

---

[26] *Id.* at 116.
[27] Fed. R. Civ. P. 56(a).
[28] *Ulissey v. Shvartsman*, 61 F.3d 805, 808 (10th Cir. 1995).
[29] *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).

to the usual inferences in its favor."[30]

**DISCUSSION**

ERISA allows individuals denied benefits under an employee benefit plan to sue in federal court to recover benefits due under the terms of the plan.[31]  The F. Family argues it is due benefits under the Plan for two reasons.  First, the F. Family argues the Administrator abused its discretion when it denied the F. Family's claim for benefits incurred before January 1, 2013, based on an unreasonable interpretation of the Plan's terms.  Second, the F. Family argues it is entitled to benefits incurred on or after January 1, 2013, because the 2013 amendment to the Plus Plan excluding coverage for residential treatment services violates the Paul Wellstone and Pete Domenici Mental Health Parity and Addiction Equity Act of 2008.

The Administrator, however, argues that it did not abuse its discretion when it denied the F. Family's claim for benefits incurred before January 1, 2013, because its denial was based on a reasonable interpretation of the Plan's terms.  The Administrator also argues that the F. Family is not entitled to benefits incurred on or after January 1, 2013, because the Plus Plan's residential treatment exclusion does not violate the Parity Act.

The court addresses the competing arguments in turn.

**I.   Benefits Incurred Before January 1, 2013**

The F. Family urges the court to reverse the Administrator's denial of pre-January 1, 2013, benefits because the Administrator based its denial on an unreasonable interpretation of the Plan's terms.  Before discussing the F. Family's argument, the court addresses the applicable

---

[30] *LaAsmar v. Phelps Dodge Corp. Life, Accidental Death & Dismemberment & Dependent Life Ins. Plan*, 605 F.3d 789, 796 (10th Cir. 2010) (citation omitted) (internal quotation marks omitted).

[31] 29 U.S.C. § 1132(a)(1)(B).  Section 1132(a)(1)(B) provides that a plan participant or beneficiary may bring a civil action "to recover benefits due to him under the terms of his plan, to enforce his rights under the terms of the plan, or to clarify his rights to future benefits under the terms of the plan."  *Id.*

standard of review.[32]

## A.  Standard of Review

The court reviews de novo a denial of benefits claimed under an ERISA plan "unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan."[33]  If the plan gives the administrator or fiduciary discretionary authority, the court "employ[s] a deferential standard of review, asking only whether the denial of benefits was arbitrary and capricious."[34]  "Under this arbitrary-and-capricious standard, [the court's] review is limited to determining whether the interpretation of the plan was reasonable and made in good faith."[35]  The Administrator bears the burden to show the arbitrary and capricious standard of review applies to its benefits decisions under the Plan.[36]

Here, the Plan grants the Administrator discretionary authority to determine eligibility for Plan benefits and to construe the terms of the Plan.  A deferential arbitrary and capricious standard therefore applies.  The F. Family, however, argues that the court should nevertheless review the denial under a less deferential standard because of an alleged conflict of interest, procedural irregularity, and breach of fiduciary duty.[37]  The court takes each argument in turn.

### 1.  Conflict of Interest

The F. Family contends that the court should temper the deference it affords the Administrator's denial because the Administrator operates under a conflict of interest.

---

[32] *See LaAsmar*, 605 F.3d at 796 ("Like the district court, we must first determine the appropriate standard to be applied to [the Plan's] decision to deny benefits." (citation omitted) (internal quotation marks omitted)).

[33] *Id.* (quoting *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 115 (1989)).

[34] *Id.*  The Tenth Circuit uses the terms "arbitrary and capricious" and "abuse of discretion" interchangeably in the ERISA context.  *Weber v. GE Grp. Life Assurance Co.*, 541 F.3d 1002, 1010 n.10 (10th Cir. 2008) (citation omitted).

[35] *LaAsmar*, 605 F.3d at 796 (citation omitted) (internal quotation marks omitted).

[36] *Id.*

[37] *See Flinders v. Workforce Stabilization Plan of Phillips Petroleum Co.*, 491 F.3d 1180, 1189–90 (10th Cir. 2007) (stating that if a plan administrator operates under a "conflict of interest or there is a serious procedural irregularity in the administrative process, it is necessary to adjust the standard of review").

A conflict of interest exists when an employer "both funds the plan and evaluates the claims."[38] "[I]f a benefit plan gives discretion to an administrator or fiduciary who is operating under a conflict of interest, that conflict must be weighed as a factor in determining whether there is an abuse of discretion."[39] The Tenth Circuit has incorporated this factor by "craft[ing] a sliding scale approach where the reviewing court will always apply an arbitrary and capricious standard, but will decrease the level of deference given in proportion to the seriousness of the conflict."[40] The conflict "should prove more important (perhaps of great importance) where circumstances suggest a higher likelihood that it affected the benefits decision."[41] But it "should prove less important (perhaps to the vanishing point) where the administrator has taken active steps to reduce potential bias and to promote accuracy."[42]

For example, a conflict should play a larger role in the analysis when an "administrator has a history of biased claims administration."[43] A conflict should play a less important role, however, when the administrator has "wall[ed] off claims administrators from those interested in firm finances" or has "impos[ed] management checks that penalize inaccurate decisionmaking irrespective of whom the inaccuracy benefits."[44]

Here, Sinclair, the Administrator, both funds the plan and evaluates the claims. This dual role suggests that the Administrator operates under a conflict of interest.[45] But "[t]he fact that [Sinclair] administered and insured the . . . plan does not on its own warrant a further reduction

---

[38] *Metro. Life Ins. Co. v. Glenn*, 554 U.S. 105, 112 (2008).
[39] *Firestone*, 489 U.S. at 115; *see also Glenn*, 554 U.S. at 117 (explaining "that when judges review the lawfulness of benefit denials, they will often take account of several different considerations of which a conflict of interest is one").
[40] *Weber*, 541 F.3d at 1010 (citation omitted) (internal quotation marks omitted).
[41] *Glenn*, 554 U.S. at 117.
[42] *Id.*
[43] *Id.*
[44] *Id.*
[45] *See Hancock v. Metro. Life Ins. Co.*, 590 F.3d 1141, 1155 (10th Cir. 2009) (noting that in light of *Glenn*, the Tenth Circuit "now weigh[s] all conflicts of interests—be they standard or inherent—as a factor in [its] review").

in deference."[46]  The F. Family must instead offer some proof that a conflict "could [have] plausibly jeopardize[d] the plan administrator's impartiality."[47]  It has failed to do so.

The F. Family contends the conflict impacted the Administrator's decision to deny the F. Family's claim because the denial resulted in a financial benefit to Sinclair.  This concern, however, is mitigated by the fact that an insurer who doubles as the administrator also "has an incentive to pay claims and to get it right so as to avoid dissatisfaction . . . and lawsuits."[48]

Pointing to its May 2012 appeal letter, the F. Family also argues the conflict influenced the Administrator's decision to initially—and incorrectly—tell the F. Family that no residential treatment was covered under the Plan at all.[49]  But the same letter also states that "[a]ccording to Andrea, of Sinclair Health Services, the only adolescent Residential Treatment Center covered by Sinclair Health is Youth Care in Draper, Utah."[50]  This suggests the Administrator notified the F. Family during initial discussions that residential treatment was available for adolescents like N.F.[51]  The F. Family has failed to meet its burden to put forth evidence that the Administrator's conflict of interest "could [have] plausibly jeopardize[d] the plan administrator's impartiality."[52]  The court will afford the conflict of interest little weight in determining if the Administrator's

---

[46] *Adamson v. Unum Life Ins. Co. of Am.*, 455 F.3d 1209, 1213 (10th Cir. 2006); *see also id.* ("Whatever the merits concerning the potential motivation of an insurer doubling as a plan administrator, such observations were never meant to be an *ipso facto* conclusive presumption to be applied without regard to the facts of the case . . . .").

[47] *Id.*

[48] *Id.*

[49] *See* REC at 95.

[50] *Id.*

[51] Sinclair filed with its motion for summary judgment a declaration by Andrea Carey, the Director of Medical Plan for Sinclair.  (Dkt. 27.)  In the declaration, Ms. Carey declares that during initial conversations with the F. Family, "Sinclair understood that [the F. Family was] seeking residential treatment for an adult."  (*Id.*)  Such treatment is not covered by the Plan.  (*Id.*)  But "as soon as Sinclair determined that the coverage being discussed was for a minor, it informed [the F. Family] that coverage would be available under the Basic Plan prior to 2013 from a network provider given that [the F. Family] had traveled to a network area."  (*Id.*).  Although the declaration sheds light on the F. Family's argument, the court declines to consider Ms. Carey's declaration for this purpose because it was not included in the administrative record.  *See Holcomb v. Unum Life Ins. Co. of Am.*, 578 F.3d 1187, 1192 (10th Cir. 2009) ("Our review is limited to the administrative record—the materials compiled by the administrator in the course of making his decision." (citation omitted) (internal quotation marks omitted)).

[52] *Adamson*, 455 F.3d at 1213.

denial was arbitrary and capricious.

## 2.  Procedural Irregularities

The F. Family next urges the court to apply a de novo standard of review, arguing the Administrator violated ERISA's claims procedure regulations.

"[S]erious procedural irregularities" can require the court to apply a de novo standard of review where deferential review would otherwise be required.[53]  That said, there is not a serious procedural irregularity requiring de novo review every time "the plan administrator's conclusion is contrary to the result desired by the claimant."[54]  Instead, "de novo review may be appropriate if the benefit-determination process did not substantially comply with ERISA regulations."[55]  For instance, the Tenth Circuit has held that de novo review is appropriate where the administrative appeal was "'deemed denied' because the administrator made no decision to which a court may defer."[56]  The Tenth Circuit has also applied de novo review where the plan administrator failed

---

[53] *Martinez v. Plumbers & Pipefitters Nat'l Pension Plan*, 795 F.3d 1211, 1215 (10th Cir. 2015); *see also Johnson v. United of Omaha Life Ins. Co.*, 775 F.3d 983, 988 (8th Cir. 2014) (holding that a procedural irregularity sufficient to trigger de novo review "must leave the court with serious doubts as to whether the result reached was the product of an arbitrary decision or the plan administrator's whim" (citation omitted) (internal quotation marks omitted)).

[54] *Adamson*, 455 F.3d at 1214 n.2; *see also Grosvenor v. Qwest Commc'ns Int'l*, 191 F. App'x 658, 662 (10th Cir. 2006) (unpublished) ("A serious procedural irregularity is not present every time a plan administrator comes to a decision adverse to the claimant on conflicting evidence.").

[55] *Hancock*, 590 F.3d at 1152.  In *Kellogg v. Metropolitan Life Insurance Co.*, 549 F.3d 818, 827–28 (10th Cir. 2008), the Tenth Circuit left open the question of whether the substantial compliance rule still applies under the revised 2002 ERISA regulations.  The Tenth Circuit has since declined to resolve the issue on several other occasions.  *See, e.g.*, *LaAsmar*, 605 F.3d at 800 ("We need not decide whether [the] 'substantial compliance' doctrine still applies to the revised regulation at issue here, 29 C.F.R. § 2560.503-1 . . . ."); *Hancock*, 590 F.3d at 1152 n.3 ("Because Ms. Hancock has failed to show any noncompliance, we need not consider whether substantial compliance is sufficient under the January 2002 revisions of ERISA."); *Rasenack ex rel. Tribolet v. AIG Life Ins. Co.*, 585 F.3d 1311, 1316 (10th Cir. 2009) ("Because AIG has failed [the] substantial compliance test, . . . we need not decide whether a minor violation of the deadlines or other procedural irregularities would entitle the claimant to *de novo* review under the 2002 amendments.").

[56] *Finley v. Hewlett-Packard Co. Emp. Benefits Org. Income Prot. Plan*, 379 F.3d 1168, 1173 (10th Cir. 2004); *see also Kellogg*, 549 F.3d at 826–28 (applying de novo review, even though the plan granted the plan administrator discretion to determine benefits eligibility, because the plan administrator never issued any decision on the claimant's administrative appeal).

to timely respond to a beneficiary's appeal.[57]

The F. Family argues the Administrator's determination was so procedurally defective as to deny the F. Family a full and fair review of its appeal in accordance with ERISA claims procedures.  ERISA requires that, "[i]n accordance with regulations of the Secretary [of Labor], every employee benefit plan shall . . . afford a reasonable opportunity to any participant whose claim for benefits has been denied for a full and fair review by the appropriate named fiduciary of the decision denying the claim."[58]  The Secretary's regulations implementing this language require, among other things, every benefit plan to provide claimants "a reasonable opportunity to appeal . . . under which there will be a full and fair review of the claim and the adverse benefit determination."[59]  A full and fair review "takes into account all comments, documents, records, and other information submitted by the claimant relating to the claim, without regard to whether such information was submitted or considered in the initial benefit determination."[60]  This requirement seeks to "enable claimants to submit informed responses to the adverse decision and to engage in meaningful dialogue with the plan administrator."[61]

The F. Family contends the Administrator violated ERISA's claims procedure regulations when it failed to meaningfully respond to the points the F. Family raised in its appeals.  The Administrator never addressed the F. Family's argument that Youthcare was not medically appropriate for N.F.  Nor did the Administrator retain anyone with medical qualifications to review the F. Family's claims.  And the Administrator likewise did not address N.F.'s medical condition, diagnosis, or treatment in making its determination.

---

[57] *See, e.g.*, *LaAsmar*, 605 F.3d at 796–99 (applying de novo review where the plan administrator resolved the administrative appeal 170 days after receiving the appeal instead of within 60 days as required by ERISA regulations).

[58] 29 U.S.C. § 1133(2).

[59] 29 C.F.R. § 2560.503-1(h)(1).

[60] *Id.* § 2560.503-1(h)(2)(iv).

[61] *Metzger v. UNUM Life Ins. Co. of Am.*, 476 F.3d 1161, 1168 n.4 (10th Cir. 2007).

The F. Family overstates the Administrator's obligations.  The Administrator based its denial on its interpretation of the Use of Network Providers During Travel provision—not on an evaluation of Youthcare's medical appropriateness or N.F.'s medical condition.  The Administrator therefore had no reason to discuss the appropriateness of Youthcare or N.F.'s medical condition, diagnosis, or treatment.  Similarly, the Administrator was not required to retain a medically qualified professional to review the claims.  An administrator must "consult with a health care professional who has appropriate training and experience in the field of medicine involved in the medical judgment" only when the administrator's "adverse benefit determination . . . is based in whole or in part on a medical judgment, including determinations with regard to whether a particular treatment . . . is . . . not medically necessary or appropriate."[62] Here, the Administrator's adverse benefit determination was not based on a medical judgment or a determination that Youthcare was medically appropriate for N.F.  The Administrator's denial was instead based on its interpretation of the Use of Network Providers During Travel provision. In short, both N.F.'s medical condition and the appropriateness of Youthcare were irrelevant to the Administrator's decision and interpretation of the Plan.[63]

 In addition, the F. Family was not prejudiced by the Administrator's decision not to address the F. Family's arguments at issue.  While the F. Family clearly disagrees with the Administrator's decisions, the F. Family cannot plausibly maintain that they were not fully aware of the rationale underlying the Administrator's decisions.[64]  In each of the Administrator's denials, the Administrator stated that the Plan does not cover treatment rendered by out-of-

---

[62] 29 C.F.R. § 2560.503-1(h)(3)(iii).

[63] *See Johnson*, 775 F.3d at 988 (declining to apply de novo review where the "alleged procedural irregularities would not have changed the outcome").

[64] *See Lunt v. Metro. Life Ins. Co.*, No. 2:05-cv-784 TC, 2007 WL 1964514, at *8 (D. Utah July 2, 2007) (concluding that the claimant suffered no prejudice under ERISA's full and fair review requirement, because the claimant was fully aware of the insurer's decision and rationale).

network providers when a beneficiary travels to an area to receive treatment.  The Administrator also directed the F. Family in its February 2013 denial to page three of the Summary Plan Description, which contains the Use of Network Providers During Travel provision.  And the Administrator's May 2013 letter explicitly states that the Administrator's denial was based on its interpretation of the Use of Network Providers During Travel provision.  The F. Family was on notice of the Administrator's underlying rationale.  That the F. Family never addressed the Use of Network Providers During Travel provision in its appeal letters—and instead relied on its own competing interpretation of the Out of Area Program provision—does not mean the Administrator denied the F. Family a full and fair review.  At bottom, the court cannot conclude the Administrator committed a serious procedural irregularity justifying de novo review.

### 3.  Breach of Fiduciary Duty

Finally, the F. Family argues that a less deferential standard of review is warranted because the Administrator breached its fiduciary duty to administer the Plan in the best interest of N.F., a beneficiary under the Plan.

ERISA imposes "higher-than-marketplace quality standards"[65] on plan administrators and requires them to "discharge [their] duties . . . solely in the interests of the participants and beneficiaries" of the plan.[66]  And "[w]hile a fiduciary has a duty to protect the plan's assets against spurious claims, it also has a duty to see that those entitled to benefits receive them.  It must consider the interests of deserving beneficiaries as it would its own."[67]  Moreover, the claims process through which a plan administrator determines a beneficiary's eligibility for benefits is not designed to be adversarial.[68]  "Indeed, one purpose of ERISA was to provide a

---

[65] *Glenn*, 554 U.S. at 115.
[66] 29 U.S.C. § 1104(a)(1).
[67] *Gaither v. Aetna Life Ins. Co.*, 394 F.3d 792, 807–08 (10th Cir. 2004).
[68] *Rasenack*, 585 F.3d at 1325.

nonadversarial method of claims settlement."[69]

The F. Family argues that the Administrator breached its fiduciary duty to N.F. because the Administrator's "justification for its denials . . . indicate an adversary bent on denial of the [F. Family's] claims."[70]  The F. Family presents no facts to support this argument.  The court cannot conclude that a plan administrator breaches its fiduciary duty to a plan beneficiary simply by interpreting a plan provision in a manner that results in a denial of the beneficiary's claims.

In sum, the court will apply an arbitrary and capricious standard of review, but will weigh the Administrator's conflict of interest as one factor in determining the lawfulness of its decision to deny the F. Family' claim for benefits.

## B.  The Administrator's Interpretation of the Plan and Rationale for Denying the Claim

Having determined the applicable standard of review, the court now examines whether the Administrator's decision to deny the F. Family's claim for benefits incurred before January 1, 2013—based on the Administrator's interpretation of the Plan—was arbitrary and capricious. The court applies the arbitrary and capricious standard of review "to the extent the administrator actually exercised a discretionary power vested in it by the terms of the Plan."[71]  To receive this deferential review, "the administrator's decision in a given case must be the valid exercise of that discretion."[72]

Under this deferential standard of review, the court considers "only the rationale asserted by the plan administrator in the administrative record"[73] and asks "whether the interpretation of

---

[69] *Gaither*, 394 F.3d at 807.
[70] Dkt. 22.
[71] *Spradley v. Owens-Ill. Hourly Emps. Welfare Benefit Plan*, 686 F.3d 1135, 1140 (10th Cir. 2012).
[72] *Gilbertson v. Allied Signal, Inc.*, 328 F.3d 625, 631 (10th Cir. 2003).
[73] *Spradley*, 686 F.3d at 1140 (quoting *Flinders v. Workforce Stabilization Plan of Phillips Petroleum Co.* 491 F.3d 1180, 1190 (10th Cir. 2007), *abrogated on other grounds by Metro. Life Ins. Co. v. Glenn*, 554 U.S. 105 (2008)).

the plan was reasonable and made in good faith."[74]   The interpretation need not be the only

logical one or even the best one.[75]   Instead, the court will uphold an administrator's decision

unless the decision "is not grounded on any reasonable basis."[76]   The court likewise will not

substitute its judgment for that of an administrator so long as the administrator's decision falls

"somewhere on the continuum of reasonableness—even if on the low end."[77]   As the claimant,

the F. Family bears the burden to prove the occurrence of a covered loss.[78]

      Here, the Administrator denied the F. Family's claim for benefits incurred before January

1, 2013, because the Plan does not provide benefits for treatment rendered by non-network

providers when a beneficiary travels to another state to receive the treatment.   The Administrator

rested its decision on its interpretations of the Out of Area Program and the Use of Network

Providers During Travel provisions.   The Administrator stated in its final denial that, under the

Out of Area Program provision, the Plan "pays benefits for non-network providers located within

the participant's non-network area" when the participant lives in a non-network area.[79]   But

under the Use of Network Providers During Travel provision, "if a participant travels to obtain

care to an area where a network provider is available," then benefits are available only "if the

participant utilizes a network provider . . . .   For this purpose, the Plan Administrator interprets

area to mean a state."[80]   The Administrator then explained that because the F. Family traveled to

Utah—a state in which there was a network residential treatment facility—so N.F. could receive

medical treatment and the F. Family's claims are for services rendered by non-network providers,

---

[74] *Weber*, 541 F.3d at 1010 (citation omitted) (internal quotation marks omitted).

[75] *Hancock*, 590 F.3d at 1155 (citation omitted).

[76] *Id.* (citation omitted) (internal quotation marks omitted).

[77] *Kimber v. Thiokol Corp.*, 196 F.3d 1092, 1098 (10th Cir. 1999) (citation omitted) (internal quotation marks omitted).

[78] *See Hancock*, 590 F.3d at 1155 ("As the claimant, Ms. Hancock bore the burden of proving the occurrence of a covered loss.").

[79] REC at 115.

[80] *Id.* at 116.

the Plan provides no benefits.

The heart of the dispute is whether the Administrator acted arbitrarily and capriciously when it interpreted "area" as used in the Use of Network Providers During Travel provision to mean a state. "A decision denying benefits based on an interpretation of an ERISA provision survives arbitrary and capricious review so long as the interpretation is reasonable."[81] The court must conduct this inquiry by examining the Plan language as a whole.[82] If the Plan term at issue "is unambiguous, and the plan administrator's interpretation differs from the unambiguous meaning, then the plan administrator's interpretation is unreasonable, and the decision to deny benefits on that interpretation is arbitrary and capricious."[83] But if the term is ambiguous— meaning it is susceptible to two or more reasonable interpretations—and "the plan administrator adopts one of [those] two or more reasonable interpretations, then the plan administrator's decision to deny benefits based on that interpretation survives arbitrary and capricious review."[84]

Applying these authorities, the court must first determine whether the term "area" as used in the Use of Network Providers During Travel provision is ambiguous.[85] To determine whether "area" is ambiguous, the court gives the term "its common and ordinary meaning as a reasonable person in the position of the plan participant would have understood the word[] to mean."[86]

The F. Family argues that the term "area" is unambiguous because the Plan's only reference to "area" is in the separate Out of Area Program provision. Under that provision, the Plan provides coverage to those who live in a non-network area. A claimant lives in a non-

---

[81] *Flinders*, 491 F.3d at 1193.

[82] *Weber*, 541 F.3d at 1011.

[83] *Flinders*, 491 F.3d at 1193; *see also id.* at 1193–94 (stating that if the court determines "the plan provision is unambiguous, then we must construe it as a matter of law").

[84] *Id.* at 1193.

[85] *See id.* ("Thus, the starting point in this and similar cases is to determine whether the relevant plan provision is ambiguous.").

[86] *Id.* (citation omitted) (internal quotation marks omitted).

network area if there are no network health care providers within a fifty mile radius of the claimant's primary residence.  A claimant who lives in such an area may use any licensed health care provider.  Based on this provision and its use of the term "area," the F. Family argues that "area" is unambiguous and that the Plan "provides coverage for treatment obtained from any licensed health care provider if there are no network providers located within 50 miles of the primary residence of the claimant."[87]  The F. Family's argument is unpersuasive.

First, that the Out of Area Program provision uses the phrase "non-network area" to refer to a fifty mile radius from the claimant's primary residence does not make the more general term "area" unambiguous.  It is only when the Plan uses the term "area" together with the modifiers "non-network" that the term has a specific definition.  But that definition says little about what "area" means when used on its own, especially when used in different Plan provisions.

Second, the definition of "non-network area" as used in the Out of Area Program provision is not applicable to situations covered by the Use of Network Providers During Travel provision.  The Out of Area Program provision includes the limiting phrase "for purposes other than obtaining health care services,"[88] which indicates that the definition of "non-network area" does not apply to situations in which a beneficiary travels for the purpose of obtaining medical treatment.  That is the situation here.

Finally, contrary to the F. Family's assertion, the term "area" is used elsewhere in the Plan.  Importantly, the term is employed in the Use of Network Providers During Travel provision to describe an undefined geographic location away from the claimant's primary residence to which the claimant has traveled.  The Plan also refers to an undefined "geographic

_____

[87] Dkt. 22.
[88] REC at 11.

20

area" from which the usual and reasonable charges for services are established,[89] an undefined geographic area where health care providers must practice for a birthing center to qualify for coverage,[90] and a "specialized area of nursing" that is necessary for a registered nurse to qualify as a clinical nurse specialist.[91]

In the end, the court concludes that the general term "area" is undefined, ambiguous, and susceptible to two or more reasonable interpretations as used in the Plan. Indeed, Garner's Modern American Usage defines "area" as "an abstract word, [which] is sometimes used almost as a space-filler."[92] The American Heritage Dictionary of the English Language also provides seven definitions for the term that vary depending on the term's usage. One of the definitions is "[a] division of experience, activity or knowledge; a field."[93] And another is "[a] roughly bounded part of the space on a surface; a region: *a farming area*; *the New York area*."[94]

Like the latter definition, a reasonable person in the F. Family's position would have understood that "area," as used in the Use of Network Providers During Travel provision, refers to a smaller part of a larger whole in a geographic sense. For example, "area" may refer to a city within a state; a state within the country; or a grouping of states within the country, such as the Pacific Northwest. The Administrator's interpretation of "area" to mean a state is consistent with a reasonable person's understanding of the term. Even though the Administrator operates under a conflict of interest, the court concludes the Administrator's denial of the F. Family's claim for benefits incurred before January 1, 2013, based on that interpretation was not arbitrary and capricious.

---

[89] *Id.* at 12.
[90] *See id.* at 50.
[91] *See id.* at 51.
[92] *Garner's Modern American Usage* 62 (3d ed. 2009).
[93] *The American Heritage Dictionary of the English Language* 97 (3d ed. 1992).
[94] *Id.*

## II.  Benefits Incurred On or After January 1, 2013

The F. Family next argues that it is entitled to benefits incurred on or after January 1, 2013, because the 2013 amendment to the Plus Plan excluding benefits for residential treatment violates the Paul Wellstone and Pete Domenici Mental Health Parity and Addiction Equity Act of 2008.

As an initial matter, the Administrator contends that the F. Family's claim for benefits incurred on or after January 1, 2013, is not properly before the court.  The Administrator points out that the F. Family stated in its Complaint that it is seeking only benefits incurred through January 1, 2013.[95]  The Administrator also notes the F. Family failed to separately name the Plus Plan as a defendant in addition to the Basic Plan.  Accordingly, the Administrator urges the court to decline to hear the F. Family's claim that the Plus Plan's residential treatment exclusion violates the Parity Act.

In response, the F. Family argues that the claim is properly before the court because "the context of the Complaint and pre-litigation appeal process makes clear that the F. Family's claims in this case go for the entire treatment periods at Moonridge and New Haven for which Sinclair did not make payment."[96]  Indeed, "[t]he F. [F]amily's pre-litigation appeal based on the Plan violating the [Parity Act] would have made no sense for claims other than for those arising" on or after January 1, 2013.[97]  And even though the F. Family did not separately name the Plus Plan as a defendant, the Basic Plan and the Plus Plan are not two separate plans: there is just one plan with varying levels of coverage.

The court generally agrees with the F. Family.  Federal Rule of Civil Procedure 8(a) requires a pleading to contain "a short and plain statement of the claim showing that the pleader

---

[95] Dkt. 2.
[96] Dkt. 34.
[97] *Id.*

is entitled to relief" and "a demand for the relief sought."[98]   Rule 8 is designed to "give the defendant fair notice of what the plaintiff's claim is and the grounds upon which it rests."[99] While "summary judgment is not a procedural second chance to flesh out inadequate pleadings,"[100] the court must construe pleadings liberally "to do justice"[101] and "prevent errors in draftsmanship from barring justice to litigants."[102]

Here, although the F. Family made a drafting error in stating it is seeking benefits through January 1, 2013, instead of through March 1, 2013, the Administrator had ample notice that the F. Family would argue the Plus Plan violates the Parity Act and seek benefits through March 1, 2013.   First, the parties addressed the alleged Parity Act violation and the F. Family's claim for benefits through March 1, 2013, in the pre-litigation appeals process.[103]   Second, the F. Family's Complaint contains several references to the Parity Act and the Administrator's denial of claims incurred through March 1, 2013.   The F. Family notes in its Complaint that "[t]he Plan argued [in its final denial] that the Act did not require coverage for residential treatment and the Plan had not violated the requirements of the Act in any way."[104]   Then in the "Cause of Action" section, the F. Family claims that "the failure of the Plan to provide coverage for N.F.'s treatment violates the requirements of the [Parity] Act."[105]   The F. Family further alleges in that section that "[t]he Plan is responsible to pay for N.F.'s medical treatment at Moon Ridge and New Haven under the

---

[98] Fed. R. Civ. P. 8(a)(2)–(3).

[99] *Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 512–13 (2002) (citation omitted) (internal quotation marks omitted).

[100] *Wasco Prods., Inc. v. Southwall Techs., Inc.*, 435 F.3d 989, 992 (9th Cir. 2006) (citation omitted) (internal quotation marks omitted).

[101] Fed. R. Civ. P. 8(e).

[102] *Carter v. Ford Motor Co.*, 561 F.3d 562, 566 (6th Cir. 2009) (citation omitted) (internal quotation marks omitted).

[103] *See* REC at 116.

[104] Dkt. 2, ¶ 45.

[105] *Id.* ¶ 5.

terms of the Plan as required under ERISA and the Act."[106]  Third, although the F. Family did not name the Plus Plan as a defendant, the Administrator has failed to show that the Plus Plan is a separate legal entity that must also be named as a defendant in this lawsuit.  The Summary Plan Description's cover states that the Summary applies to the Basic Plan and the Plus Plan. [107]  And the first line of the Summary's Introduction section clarifies that Sinclair is the Plan sponsor of both the Basic Plan and the Plus Plan. [108]  Even if the Plus Plan is separate from the Basic Plan, the Administrator has offered no explanation for why it has waited until this late stage to raise what is otherwise a technical issue.  In short, the court agrees with the F. Family that the Basic Plan and the Plus Plan should not here be viewed or treated as two entirely separate plans.  The F. Family's claim for benefits incurred on or after January 1, 2013, is properly before the court.

The court now turns to the merits of the F. Family's argument that the Plus Plan violates the Parity Act.  The court's analysis proceeds in three parts.  First, the court provides the standard of review.  Second, the court discusses the Parity Act generally.  And third, the court examines whether the Plus Plan's residential treatment exclusion violates the Parity Act.

### A.  Standard of Review

Although the court reviews the Plan Administrator's decision to deny benefits based on its interpretation of Plan terms under an arbitrary and capricious standard, the court affords the Administrator's interpretation of the Parity Act no deference because the interpretation of a statute is a legal question.[109]

When interpreting a federal statute, the court's goal is to effectuate Congress's intent.[110]

---

[106] *Id.* ¶ 7.
[107] *See* REC at 8.
[108] *See id.* at 10.
[109] *See Foster v. PPG Indus. Inc.*, 693 F.3d 1226, 1233 (10th Cir. 2012).
[110] *United States v. Am. Trucking Ass'ns*, 310 U.S. 534, 542 (1940).

24

To that end, the court must begin by examining "the language employed by Congress."[111]  If the statutory language is plain and unambiguous, then the court enforces it according to its terms.[112]  But if the statutory language is ambiguous, then the court "must turn to other sources to find its meaning."[113]  Statutory language is ambiguous if it is reasonably "susceptible to more than one interpretation."[114]  In determining whether language is plain or ambiguous, the court looks not only to the statutory language itself, but also to "the specific context in which that language is used, and the broader context of the statute as a whole."[115]  To resolve any ambiguity, the court may look to the statute's "broader context" and "primary purpose."[116]

### B.  The Parity Act

Congress enacted the Mental Health Parity Act in 1996, requiring group health plans to impose the same "aggregate lifetime and annual dollar limits for mental health benefits and medical and surgical benefits."[117]  Congress amended the MHPA when it passed the Paul Wellstone and Pete Domenici Mental Health Parity and Addiction Equity Act of 2008.[118]

---

[111] *Wright v. Fed. Bureau of Prisons*, 451 F.3d 1231, 1234 (10th Cir. 2006); *see also Park 'N Fly, Inc. v. Dollar Park & Fly, Inc.*, 469 U.S. 189, 194 (1985) ("Statutory construction must begin with the language employed by Congress and the assumption that the ordinary meaning of that language accurately expresses the legislative purpose.").

[112] *King v. Burwell*, 135 S. Ct. 2480, 2489 (2015); *see also Robinson v. Shell Oil Co.*, 519 U.S. 337, 340 (1997) ("Our first step in interpreting a statute is to determine whether the language at issue has a plain and unambiguous meaning with regard to the particular dispute in the case.").

[113] *S. Utah Wilderness Alliance v. Office of Surface Mining Reclamation & Enforcement*, 620 F.3d 1227, 1237–38 (10th Cir. 2010).

[114] *Wright*, 451 F.3d at 1235; *see also S. Utah Wilderness Alliance*, 620 F.3d at 1238 ("The language used in a statute . . . is ambiguous if it is 'capable of being understood in two or more possible senses or ways.'" (quoting *Chickasaw Nation v. United States*, 534 U.S. 84, 90 (2001))).

[115] *Robinson*, 519 U.S. at 341; *see also Burwell*, 135 S. Ct. at 2489 ("[W]hen deciding whether the language is plain, we must read the words in their context and with a view to their place in the overall statutory scheme." (citation omitted) (internal quotation marks omitted)).

[116] *Robinson*, 519 U.S. at 345–46.

[117] IFRs Under the Parity Act, 75 Fed. Reg. 5410-01, 5411 (Feb. 2, 2010).

[118] *Id.*; *see also* 29 U.S.C. § 1185a.  Congress enacted the Parity Act as an amendment to ERISA, making it enforceable through a cause of action under 29 U.S.C. § 1132(a)(3) as a violation of a "provision of this subchapter." *A.F. ex rel. Legaard v. Providence Health Plan*, 35 F. Supp. 3d 1298, 1304 (D. Or. 2014); *see also* 29 U.S.C. § 1132(a)(3)(A)–(B) ("A civil action may be brought by a participant, beneficiary, or fiduciary (A) to enjoin any act or practice which violates any provision of this subchapter or the terms of the plan, or (B) to obtain other appropriate equitable relief (i) to redress such violations or (ii) to enforce any provisions of this subchapter or the terms of the

The Parity Act was "designed to end discrimination in the provision of coverage for mental health and substance use disorders as compared to medical and surgical conditions in employer-sponsored group health plans and health insurance coverage offered in connection with group health plans."[119]   The Parity Act is self-implementing and became effective for most plan years beginning after October 3, 2009.[120]   As relevant here, it states:

> In the case of a group health plan (or health insurance coverage offered in connection with such a plan) that provides both medical and surgical benefits and mental health or substance use disorder benefits, such plan or coverage shall ensure that—
> . . .
> (ii) the treatment limitations applicable to such mental health or substance use disorder benefits are no more restrictive than the predominant treatment limitations applied to substantially all medical and surgical benefits covered by the plan (or coverage) and there are no separate treatment limitations that are applicable only with respect to mental health or substance use disorder benefits.[121]

Stated otherwise, if a group health plan provides both medical and surgical benefits as well as mental health or substance use disorder benefits, then it may not apply any "treatment limitation to mental health or substance use disorder benefits in any classification that is more restrictive than the predominant . . . treatment limitation of that type applied to substantially all medical/surgical benefits in the same classification."[122]   And if a plan "provides mental health or substance use disorder benefits in any classification of benefits . . . , mental health or substance use disorder benefits must be provided in every classification in which medical/surgical benefits are provided."[123]

---

plan."). The F. Family brought its single cause of action under 29 U.S.C. § 1132(a)(1)(B). Because the Plan makes nothing of the F. Family's failure to bring its claim under § 1132(a)(3), neither will the court.

[119] *Am. Psychiatric Ass'n v. Anthem Health Plans*, 50 F. Supp. 3d 157, 160 (D. Conn. 2014) (quoting *Coal. for Parity, Inc. v. Sebelius*, 709 F. Supp. 2d 10, 13 (D.D.C. 2010)).

[120] IFRs Under the Parity Act, 75 Fed. Reg. at 5419.

[121] 29 U.S.C. § 1185a(a)(3)(A)(ii).

[122] 29 C.F.R. § 2590.712(c)(2)(i) (amended Jan. 13, 2014); *see also* IFRs Under the Parity Act, 75 Fed. Reg. at 5413.

[123] 29 C.F.R. § 2590.712(c)(2)(ii).

The rules interpreting the Parity Act define "type" as referring to treatment limitations of the same nature.[124]  Further, a treatment limitation must be compared only to a treatment limitation of the same type within a particular classification.[125]  There are six classifications: (1) inpatient, in-network; (2) inpatient, out-of-network; (3) outpatient, in-network; (4) outpatient, out-of-network; (5) emergency care; and (6) prescription drugs.[126]

The rules also clarify that the term "treatment limitations" includes both "quantitative treatment limitations, which are expressed numerically (such as 50 outpatient visits per year), and nonquantitative treatment limitations, which otherwise limit the scope or duration of benefits for treatment under a plan."[127]  The parity requirement governing nonquantitative treatment limitations provides:

> A group health plan (or health insurance coverage) may not impose a
> nonquantitative treatment limitation with respect to mental health or
> substance use disorder benefits in any classification unless, under the terms
> of the plan (or health insurance coverage) as written and in operation, any
> processes, strategies, evidentiary standards, or other factors used in
> applying the nonquantitative treatment limitation to mental health or
> substance use disorder benefits in the classification are comparable to, and
> are applied no more stringently than, the processes, strategies, evidentiary

---

[124] *See id.* § 2590.712(c)(1)(ii).  The Parity Act charges three federal agencies with administering the statute: the Department of Labor, the Department of Health and Human Services, and the Department of the Treasury.  *See* 29 U.S.C. § 1185a(g).  In April 2009, the Departments solicited comments on the Act's application. Request for Information Regarding the Parity Act, 74 Fed. Reg. 19155 (Apr. 28, 2009).  The Departments then issued interim final rules in February 2010, instead of soliciting comments on a proposed rule, after concluding it was necessary to provide prompt guidance for members of the regulated community.  IFRs Under the Parity Act, 75 Fed. Reg. at 5419.  The interim final rules became effective for most plan years beginning on or after July 1, 2010. 29 C.F.R. § 2590.712(i)(1). After soliciting further comment, the Departments issued final rules in November 2013. Final Rules Under the Parity Act, 78 Fed. Reg. 68240-01, 68240 (Nov. 13, 2013).  The final rules apply to plan years beginning on or after July 1, 2014.  *Id.*  Because the F. Family seeks benefits through only March 1, 2013, the court looks only to the interim final rules—not the final rules—in determining whether the Plus Plan's residential treatment exclusion violates the Parity Act.

[125] *See* 29 C.F.R. § 2590.712(c)(1)–(2); *see also* IFRs Under the Parity Act, 75 Fed. Reg. at 5413 (stating that the parity requirements under the Parity Act for treatment limitations are applied on a classification-by-classification basis).

[126] 29 C.F.R. § 2590.712(c)(2)(ii).

[127] *Id.* § 2590.712(a); *see also* 29 U.S.C. § 1185a(a)(3)(B)(iii) ("The term 'treatment limitation' includes limits on the frequency of treatment, number of visits, days of coverage, or other similar limits on the scope or duration of treatment."); IFRs Under the Parity Act, 75 Fed. Reg. at 5412 ("A nonquantitative treatment limitation is a limitation that is not expressed numerically, but otherwise limits the scope or duration of benefits for treatment.").

standards, or other factors used in applying the limitation with respect to medical surgical/benefits in the classification, except to the extent that recognized clinically appropriate standards of care may permit a difference.[128]

Notwithstanding the parity requirement, "[n]othing in [the Parity Act] shall be construed as requiring a group health plan (or health insurance coverage offered in connection with such a plan) to provide any mental health or substance use disorder benefits."[129]

### C. The Plus Plan's Residential Treatment Exclusion

The court now turns to whether the Plus Plan's residential treatment exclusion violates the Parity Act. The Plus Plan, of which N.F. became a beneficiary beginning on January 1, 2013, provides no benefits for services received at a residential treatment facility.[130]

The Administrator argues that the Plus Plan's residential treatment exclusion does not violate the Parity Act, because the Plus Plan denies benefits for residential treatment services across the board, regardless of whether the services are for medical and surgical conditions or mental health and substance abuse disorder conditions. The Administrator attempts to bolster this argument by noting that it provides skilled nursing services for both types of conditions.

---

[128] 29 C.F.R. § 2590.712(c)(4)(i).

[129] 29 U.S.C. § 1185a(b)(1).

[130] The F. Family argues that the court may not consider the terms of the Plus Plan, because it is not part of the administrative record compiled by the Plan Administrator. *See Spradley*, 686 F.3d at 1140 (holding that a court must "consider only the rationale asserted by the plan administrator in the administrative record and determine whether the decision, based on the asserted rationale, was arbitrary and capricious"); *see also LaAsmar*, 605 F.3d at 801 (holding that the court is limited to considering only the rationale given by the plan administrator for denying benefits). In contrast, the Administrator argues that the court may consider the Plus Plan's terms because the court may supplement the record when circumstances indicate that additional evidence is necessary to conduct an adequate review. *See Hall v. UNUM Life Ins. Co. of Am.*, 300 F.3d 1197, 1202 (10th Cir. 2002) (holding that a district court may supplement the record in an ERISA case "when circumstances clearly establish that additional evidence is necessary to conduct an adequate *de novo* review of the benefit decision" (citation omitted) (internal quotation marks omitted)). While both parties correctly articulate Tenth Circuit law, those rules apply when the court is reviewing a plan administrator's decision to deny benefits based on the terms of the plan. Neither party, however, articulates how those rules apply when the court is reviewing a plan's compliance with a federal statute, such as the Parity Act. Nevertheless, even though the Plus Plan is not part of the pre-litigation record submitted by the parties, the Administrator has submitted the relevant parts of the Plus Plan as an exhibit. In addition, the Administrator's denial letters show that the Administrator considered the Plus Plan in arriving at its decision. The court concludes that it may properly consider the terms of the Plus Plan.

The F. Family argues that, under the Parity Act, the Plus Plan may permissibly exclude coverage for sub-acute inpatient treatment for mental health disorders, such as services received at a residential treatment facility, only if the Plus Plan also excludes coverage for sub-acute inpatient treatment for physical conditions, such as services received at a skilled nursing facility. But here, the F. Family contends the residential treatment exclusion violates the Parity Act because the Plus Plan does not cover services received at residential treatment facilities—which treat only mental health and substance use disorders—yet does cover services received at skilled nursing facilities—which do not treat mental health or substance use disorders.  In other words, the F. Family argues that residential treatment facilities and skilled nursing facilities are analogous but, contrary to the Administrator's belief, not identical.  So, if the Plus Plan is going to cover treatment received at a skilled nursing facility, which provides only medical and surgical treatment, then the Act requires that it also cover treatment received at a residential treatment facility, which provides only mental health and substance use disorder treatment.

Based on the foregoing arguments, the parties seemingly agree that the residential treatment exclusion is a nonquantitative treatment limitation.  The crux of the dispute is whether the limitation is a permissible one.

As stated above, the Parity Act first states that treatment limitations applicable to mental health benefits must be "no more restrictive than the predominant treatment limitations applied to substantially all medical and surgical benefits."[131]   The Act further states that a plan must ensure "there are no separate treatment limitations that are applicable only with respect to mental health . . . benefits."[132]  Here, by its terms, the Plus Plan's residential treatment exclusion runs afoul of the clear and unambiguous language of the Parity Act's second requirement.

---

[131] 29 U.S.C. § 1185a(a)(3)(A)(ii).
[132] *Id.*

29

Like the Basic Plan, the Plus Plan defines a residential treatment facility as "[a] child-care institution that provides residential care and treatment for emotionally disturbed children and adolescents."[133]  This definition shows that, before the Plus Plan's amendments went into effect on January 1, 2013, residential treatment benefits were available only for mental health conditions.  When the Plus Plan eliminated coverage for residential treatment services, it necessarily imposed a treatment limitation that applies only with respect to mental health conditions.  This violates the plain language of the Parity Act.[134]

To be sure, the Parity Act does not require plans to provide mental health or substance use disorder benefits at all.[135]  But once a plan does provide such benefits, the plan must do so on a level that is on par with the benefits it provides for medical and surgical benefits.  And once provided, the Parity Act prohibits imposing treatment limitations applicable only to mental health benefits.

Further, although the Administrator argues that the exclusion applies across the board, there is no evidence to suggest that coverage for residential treatment would have been available for medical or surgical conditions but for the exclusion.  Without evidence to that effect, the Administrator's argument that it would have also denied residential treatment benefits for medical or surgical conditions under the exclusion is illusory.

The court concludes that the Plus Plan's residential treatment exclusion violates the Parity Act because the exclusion is a "separate treatment limitation[] that [is] applicable only with

---

[133] Dkt. 27, Ex. 1, at 11.

[134] *See, e.g.*, *Craft v. Health Care Serv. Corp.*, 84 F. Supp. 3d 748, 754 (N.D. Ill. 2015) (denying the insurer's motion to dismiss where the plan excluded all residential treatment care, except for inpatient substance abuse rehabilitation treatment, in part because the exclusion prevented beneficiaries "from receiving 24-hour supervision and care in a non-hospital setting" and "[t]here is no corresponding limitation on the treatment of medical conditions"); *A.F. ex rel. Legaard v. Providence Health Plan*, 35 F. Supp. 3d 1298, 1315 (D. Or. 2014) (holding that the plan's exclusion of services "related to developmental disabilities, developmental delays or learning disabilities" violated the Parity Act because the "exclusion is overtly applicable only to mental health conditions—specifically developmental disabilities—and does not apply to medical or surgical conditions").

[135] 29 U.S.C. § 1185a(b)(1).

respect to mental health . . . benefits."[136]  In arriving at this conclusion, the court expresses no judgment about the wisdom of the Parity Act itself.

As for the appropriate remedy, the F. Family urges the court to award it the benefits it incurred on or after January 1, 2013, because the Plus Plan's residential treatment exclusion—the basis on which the Administrator denied the F. Family's claim—violates the Parity Act.  The court, however, finds that remanding the matter to the Administrator is more appropriate.[137]  On remand, the Administrator will have an opportunity to evaluate in the first instance whether it owes the F. Family benefits incurred on or after January 1, 2013, based on the Administrator's interpretation of the Plus Plan's terms.

## CONCLUSION

For the reasons stated above, the court GRANTS the F. Family's motion for summary judgment (Dkt. 22) in part and DENIES it in part.  The court also GRANTS Sinclair's motion for summary judgment (Dkt. 21) in part and DENIES it in part.  The Clerk of Court is directed to close the case.

**SO ORDERED** this 22nd day of January, 2016.

BY THE COURT:

ROBERT J. SHELBY
United States District Judge

---

[136] *Id.* § 1185a(a)(3)(A)(ii).

[137] *See Scruggs v. ExxonMobil Pension Plan*, 585 F.3d 1356, 1360 (10th Cir. 2009) ("The district court is vested with discretion to remand a case to the plan administrator for a renewed evaluation of the claimant's case.").